# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RYAN SCOTT KURZINSKY, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| PETZL AMERICA, INC., | : | No. 17-1234 |
| Defendant. | : | |

## MEMORANDUM OPINION

**Timothy R. Rice**                                                                         January 16, 2019
**U.S. Magistrate Judge**

     Defendant Petzl America, Inc. moves for summary judgment on the negligence, strict liability, and implied warranty claims brought against it by Plaintiff Ryan Kurzinsky. Def. Mot. (doc. 36) at 1; Pl. Resp. (doc. 39) at 1; see also Reply (doc. 44). For the following reasons, I grant summary judgment in favor of Defendant Petzl on all claims and dismiss this suit.

## I.    LEGAL STANDARD

     Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The evidence and any inferences from the evidence must be viewed in the light most favorable to the non-moving party. See Ray v. Warren, 626 F.3d 170, 173 (3d Cir. 2010). If reasonable minds could conclude that there are sufficient facts to support one of Kurzinsky's claims, Petzl's summary judgment motion should be denied. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). It should be granted only if no "reasonable jury could return a verdict" for Kurzinsky based on the evidentiary record. Reedy v. Evanson, 615 F.3d 197, 210 (3d Cir. 2010).

## II. FACTS IN THE LIGHT MOST FAVORABLE TO KURZINSKY

On or about July 4, 2016, Kurzinsky purchased a used Petzl Tandem Speed Pulley (the "Pulley") from an anonymous eBay seller. Plaintiff's Proposed Undisputed Facts ("PUD") (doc. 40) ¶ B.1. Kurzinsky intended to use the Pulley in a homemade backyard zip line. Id. ¶ B.2. The eBay seller described the Pulley as a "zipline trolley" in "great working condition." Id.; Pl. Resp. Ex. B ("Pl. Ex. B").

A sticker on the Pulley includes the words "Petzl" and "Tandem Speed" along with three cartoons. Def. Ex. F; see also Def. Ex. G at 81 (Kurzinsky saw the sticker before incorporating the Pulley into his zip line). The first cartoon is of a book slightly overlapping a triangle around an exclamation point. Def. Ex. F. The second cartoon, next to the words "Tandem Speed," is a drawing of a ball bearing joint, and the third is a cartoon of a zip liner crashing into a cliff with a skull-and-crossbones. Id.

The Pulley came with at least a few of Petzl's six pages of warnings and instructional materials, but without its original product box or "hang tag." PUD ¶ B.2, Def. Mot. at 22, Def. Ex. L; see also Ex. A, attached. Kurzinsky reviewed all six pages of Petzl's warnings and instructions before building his zip line.[1] Pl. Ex. A at 172; PUD ¶ B.3. The first page shows a drawing of a seated, helmeted zip liner, using the Pulley on a single line. Id. It also includes three cartoons of zip liners using the Pulley for tyrolean traverse in double-line systems.[2] Id. The first page further includes a combination of pictures and language that detail the Pulley's

---

[1] Petzl disputes Kurzinsky's claim that he reviewed all warnings and instructions before using the product. Def. Mot. at 22. This dispute does not require resolution by a jury because, even viewed in the light most favorable to Kurzinsky – i.e., even if I assume he reviewed all Petzl's warnings and instructions before using the product – his claims fail.

[2] Tyrolean traverse is a mountaineering maneuver in which climbers attach themselves to suspended ropes or cables and use their arms to pull themselves across, e.g., a river or gorge. https://www.climbing.com/skills/how-to-do-the-tyrolean-traverse/ (last visited Jan. 10, 2019).

braking load and working load limit, the size of the ropes and/or cables required, and the maximum speed. Id. With a combination of pictures and words, this first page explains that speed pulleys use ball bearings, while cable pulleys use self-lubricating bushings. Id.

The second page contains cartoons of various hazards associated with using the Pulley, including hurting one's hand while grabbing a rope or cable, catching one's hair in gears, and being stranded in the middle of a sagging zip line. Id. at 2. One cartoon with two panels shows that a single-line zip liner using a cable pulley will be "OK!," while a single-line zip liner using a speed pulley at the same angle of descent will crash. Id. In addition to depicting the zip liner crashing into the cliff, the speed pulley cartoon has an exclamation point inside a triangle. Id. Other cartoons on the second page show how to use the Pulley in direct and indirect hauling systems. Id.

The third page contains a series of four cartoons, depicting an individual attached to a zip line but standing on the ground, with an arrow and two large question marks suggesting a zip liner must determine how low his or her line will sag. Id. at 3. It contains three additional cartoons, each adorned with a skull-and-crossbones and a giant "X," depicting zip line users crashing their heads on the ground at the end of zip lines, and hitting the ground in the middle of a zip line that passes too low over a ridge. Id.

The fourth, fifth, and sixth pages contain "instructions for use" in 18 different languages. Id. at 4-6. The only English-language instructions are on the fourth page. Id. at 4. In accordance with a diagram on the first page of the instructions, the various parts of the Pulley are identified. Id. The instructions state the "Fixed-side double pulley with stainless steel sheaves [is] for use on a cable or rope tyrolean." Id. Then: "Attention, the installation and use of a cable tyrolean requires the abilities of an expert. A cable tyrolean creates much greater stress on

anchor points than a rope tyrolean." Id. There are no instructions for setting up a single line zip line like the kind Kurzinsky built in his backyard. Instead, the instructions name and provide specific advice for the five double-cable tyrolean setups depicted on the first two pages of the instructions. Id.

After purchasing the Pulley and separately purchasing a cable from Home Depot, Kurzinsky set up the zip line in his backyard with the help of his brother. Id. ¶ B.5. Kurzinsky reviewed instructional videos prior to setting up the zip line in his backyard. Id. ¶ B.6. The instructional videos were not created by Petzl, marketed by Petzl, or found via the Petzl website. Def. Ex. G at 43. Instead, Kurzinsky located the videos using Google and YouTube. Id. These videos repeatedly recommended Petzl pulleys as "the best" for zip line use. Id. at 46.

Kurzinsky knew the used Pulley he purchased through eBay did not incorporate a braking system before he decided to use it. Id. at 193. When his zip line was assembled, Kurzinsky and his brother tested it by first sending the wooden seat they had attached to it down the line without a passenger. Def. Ex. E at 7. Next, they used it themselves. Id.; Pl. Ex. A at 106. Seated on the wooden seat, Kurzinsky was suspended approximately two to three feet off the ground. PUD ¶ B.7; Def. Ex. G at 206. With the wooden seat attached, the zip line worked as expected without any great speed. PUD ¶ B.8. Kurzinsky and his brother both successfully traversed the zip line without incident using the seat on July 9, 2016. Id.

On the morning of July 10, 2016, Kurzinsky replaced the seat with a straight bar. Id. ¶ B.9. With just the straight bar, Kurzinsky was more than nine feet off the ground. Pl. Ex. A at 113. He did not test the straight bar without a passenger first. Def. Ex. E at 7. Using just the straight bar, Kurzinsky traveled at a much higher rate of speed than he had traveled with the seat attachment. PUD ¶¶ B.10-11. The additional speed caused him to lose his grip and fall to the

4

ground, sustaining severe injuries. Id. ¶¶ B.10-12.

The instructions from the Petzl website and insert that Kurzinsky reviewed are identical to those attached to the Pulley when it is purchased new. Id. ¶¶ B.15-17. The box that the Pulley would have come in had Kurzinsky purchased it new does not contain any additional safety instructions regarding zip line setup or use beyond those that Kurzinsky reviewed on the Petzl website. Id. ¶ B.18.

Petzl knew that its Pulley could be utilized as a component of a zip line system. Id. ¶ B.19. Petzl's testing of the Pulley included zip line testing. Id. Petzl contemplated that a straight bar could be attached to the Pulley to traverse a zip line. Id. ¶ B.20. Petzl also contemplated that the Pulley could be used for other purposes, including for hauling. Def. Ex. I at 1. Petzl does not manufacture Pulleys with built-in braking mechanisms. Id. at 1-2. The Pulley's functionality for other uses, including direct and indirect hauling, tyrolean traverse, and rope tensioning, would be degraded if it included a built-in braking mechanism. Id. at 1.

Petzl pulleys are sometimes "sold with" zip line braking mechanisms like the "Brakehawk," which allows users to slow and stop themselves. Def. Ex. E at 15-16. Commercial zip line standards require zip lines to incorporate a braking system that functions independently of the user, either in addition to or in place of a user-operated braking system. Def. Ex. I at 2 (citing ANSI-ACCT 03-2016). These braking mechanisms are safer than user-operated braking systems like the Brakehawk because they are not vulnerable to user error. Id.

### III. ANALYSIS

Kurzinsky brought three claims: (1) negligence, (2) product liability, and (3) breach of implied warranty. Cplt. (doc. 4) at 3-6. Petzl seeks to dismiss them all. Def. Mot. at 1.

5

1. <u>Strict Liability</u>[3]

Pennsylvania[4] follows the Restatement (Second) of Torts for strict liability, which requires a plaintiff to prove: (1) a defective condition (2) that proximately caused an injury and (3) existed at the time the product left the manufacturer's control. <u>Tincher v. Omega Flex, Inc.</u>, 104 A.3d 328, 335 (Pa. 2014). Defective conditions come in various forms, including "manufacturing defects," "design defects," and informational defects known as "failure to warn" cases. <u>Dorshimer v. Zonar Systems, Inc.</u>, 145 F. Supp. 3d 339, 351 (M.D. Pa. 2015). Kurzinsky does not pursue a manufacturing defect theory, Pl. Resp. at 16-17, but instead poses alternate design defect and failure to warn theories, <u>id.</u> at 15-19. He argues Petzl's failure to include a built-in braking system constituted a design defect, and the failure to adequately inform consumers of the dangers that come from not having a braking system constituted a failure to warn. <u>Id.</u>

To establish a "design defect," a plaintiff can use either the Consumer Expectations Test or the Risk Utility Test. <u>Tincher</u>, 105 A.3d at 401. Under the Consumer Expectations Test, a plaintiff must show "the risks are greater than a reasonable buyer would expect," meaning the specific danger "is unknowable and unacceptable to the average or ordinary consumer." <u>Id.</u> at 387. To determine a reasonable consumer's expectations, juries are instructed to consider: (i) the nature of the product, (ii) the identity of the user, (iii) the intended use of the product, (iv) the intended user, and (v) any implied/express representations from the manufacturer/seller regarding the product. <u>Id.</u>

Under the Risk Utility Test, a design is defective "if a reasonable person would conclude

---

[3] Like the parties, I will address the claims out of order for clarity's sake. <u>Id.</u> at 10; Pl. Mot. at 10.

[4] Both parties concede that Pennsylvania law applies to Kurzinsky's claims. <u>See</u> Def. Mot. at 9-10; Pl. Resp. at 9.

that the probability and seriousness of the harm caused by the product outweigh the burden or costs of taking precautions." Rapchak v. Haldex Brake Prods. Corp., No. 13-1307, 2016 WL 1019534, at *13 (W.D. Pa. March 15, 2016) (citing Tincher, 104 A.3d at 389). Under this measure, the jury assesses the manufacturer's "conduct in manufacturing or designing a product," and considers: (1) the product's usefulness, (2) the product's likelihood of causing injury, (3) the availability of safer substitutes for the product, (4) whether the product can be made safer, (5) whether the product can be used safely by a customer exercising care, (6) whether users are aware of the product's inherent dangers generally or due to warnings/instructions, and (7) whether the manufacturer can spread the loss via pricing or carrying insurance related to the product. Id. at 390.

To prevail on a failure to warn theory, Kurzinsky must show the Pulley is unreasonably dangerous with the warning provided, and that the absence of warning was the proximate cause of his injury.[5] Berkebile v. Brantly Helicopter Corp., 337 A.2d 893, 901-03 (Pa. 1975). The duty to warn does not require manufacturers "to instruct all beginners or foreseeable users in the intricacies of and principles underlying the product," but only "notify the intended users of the nonobvious dangers inherent in the product." Makadji v. GPI Div. of Harmony Enters., Inc., No. 05-3044, 2006 WL 3498324, at *3 (E.D. Pa. Dec. 1, 2006).

Kurzinsky need not prove conclusively that he followed all of Petzl's warnings/instructions due to Pennsylvania's "heeding presumption," which provides that plaintiffs are presumed to have followed all warnings/instructions in strict liability cases. Colegrove v. Cameron Mach. Co., 172 F. Supp. 2d 611, 617 (W.D. Pa. 2001) (citing Pavlik v.

---

[5] It is unclear whether Pennsylvania "requires courts to make the initial determination on the adequacy of the warning." Hatcher v. SCM Gr. N. Am., Inc., 167 F. Supp. 3d 719, 726 (E.D. Pa. 2016) (discussing the contradictory precedents).

7

Lane Ltd. Tobacco Exporters Int'l., 135 F.3d 876, 883 (3d Cir. 1998)). Nonetheless, the "heeding presumption" is rebuttable, and does not abrogate Kurzinsky's obligation to provide sufficient evidence for a juror to find that, if the warnings he claims would have been adequate had been provided, he would have heeded them. Id. Moreover, there is no duty to warn consumers of "open and obvious" dangers under Pennsylvania law. Fleck v. KDI Sylvan Pools, Inc., 981 F.2d 107, 119 (3d Cir. 1997) (citing Sherk v. Daisy-Heddon, 427 A.2d 657, 660 (Pa. Super. 1981)).

Finally, component manufacturers are not required to warn of all dangers associated with any system into which they can be incorporated. Jacobini v. V&O Press Co., 588 A.2d 476, 479 (Pa. 1991); see also Morris v. Johnson Controls, Inc., No. 04-1574, 2005 WL 645231, at *3 (E.D. Pa. March 18, 2005) ("[A] manufacturer will not be held liable for negligent failure to warn of a defect where the manufacturer merely supplied component parts of a product later assembled by another party, and the danger is associated only with the use of the finished product.").

Kurzinsky claims the Pulley is unreasonably dangerous because his zip line traveled too fast when he used it with the straight bar. Pl. Ex. A at 121. He relies on the report from his expert, C.J. Abraham, P.E., to constitute sufficient evidence from which a jury could find the failure to include a built-in braking system was a design defect that rendered the Pulley unreasonably dangerous to consumers.[6] Pl. Resp. at 15-16. He argues this danger meets both the Consumer Expectations Test and the Risk Utility Test. Def. Ex. E at 16.

Kurzinsky also relies on Abraham to contend the information provided with the Pulley

---

[6] The parties also dispute whether Abraham's report is admissible under F.R.E. 702. Def. Mot. at 11-15; Pl. Resp. at 11-15. Because I find Kurzinsky's claims fail even if Abraham's report is admitted, I need not resolve this dispute.

8

was inadequate because it failed to warn him of the dangers associated with zip lining without a braking mechanism and failed to inform him that he could purchase a full zip line kit that would include a braking system. Id. ("Petzl never placed Mr. Kurzinsky on notice so that he can make a prudent decision with reference to purchasing a complete kit from Petzl and follow their instructions which would incorporate a braking system with a pulley and a harness.").

According to Abraham, the warnings should have stated:

!DANGER!

ZIP LINING IS AN EXTREMELY DANGEROUS ACTIVITY

IF THE PRODUCT WAS PURCHASED SPECIFICALLY FOR ZIP LINING, YOU MUST READ AND UNDERSTAND THE ENCLOSED SAFETY INSTRUCTIONS

AFTER READING ALL INSTRUCTIONS AND DIAGRAMS, IF YOU FEEL, FOR ANY REASON, THAT YOU DO NOT UNDERSTAND THEM, PLEASE CONTACT PETZL PRIOR TO USING THIS PRODUCT

IF THE INSTALLATION DOES NOT INCORPORATE ALL OF THE SFAETY PROTOCOL AND EQUIPMENT, THERE IS A HIGH PROBABILTY YOU CAN PERMANENTLY INJURE YOURSELF OR OTHERS

ONCE INSTALLED, THE INSTALLATION SHOULD BE INSPECTED BY A CERTIFIED SAFETY SPECIALIST IN ZIP LINING

*FAILURE TO FOLLOW THESE INSTRUCTIONS AND WARNINGS COULD RESULT IN A TRAUMATIC INJURY OR DEATH.*

Id. at 16-17.

Abraham further opined that "the pulley did not perform as expected when used in a reasonably foreseeable way as part of the recreational activity of zip lining." Id. at 19.

I disagree. Even viewed in the light most favorable to Kurzinsky, a reasonable jury could not find the Pulley contained a design defect. Further, the warnings are sufficient as a matter of law. Even if they were not, Kurzinsky is unable to establish that their insufficiency proximately caused his damage because he testified that he chose to rely on information provided by sources

9

other than Petzl and would not have heeded additional warnings even if Petzl had provided them. Def. Ex. G at 202.

The Pulley was merely a component of a zip line system designed by Kurzinsky, and "[a]ll the decisions and actions whereby the danger was created" were his. Wenrick v. Schloeman-Siemeng Aktienbgesellschaft, 564 A.2d 1244, 1248 (Pa. 1989). Kurzinsky designed the length, the angle, and the "sag" of the zip line, and knew enough of the potential dangers to send the seat mechanism down the line on its own on July 9 before trying it himself. PUD ¶ B.5; Def. Ex. E at 7. He knew the system did not include any braking mechanism. Def. Ex. G at 193. Nothing in Petzl's design or warnings changed between July 9 and July 10 to induce Kurzinsky to ride the zip line without testing it after switching out the seat for the straight bar. The additional danger of a bar over a seat is both "open and obvious," Fleck, 981 F.2d at 119, and the kind of danger created entirely by the system designer, Morris, 2005 WL 645231, at *3.

Even setting aside Petzl's reduced liability as a mere component manufacturer and analyzing the case under other strict liability principles, Kurzinsky's claims fail.

Consumer Expectations

Kurzinsky argues he can establish a design defect that meets the Consumer Expectations Test based on Abraham's opinion that including braking mechanisms and/or brake kits "would be [a] safe design at a minimal cost." Pl. Resp. at 16.

But the Pulley is not exclusively, and perhaps not even primarily, intended for use as part of a zip line. Def. Ex. I at 1. Kurzinsky has failed to produce sufficient evidence to create a genuine dispute as to this fact, which is both asserted by Petzl, id., and evidenced by the product insert Kurzinsky reviewed, Ex. A. That insert provides explicit instructions on using the Pulley for tyrolean traverse and hauling, warns the user not to use speed pulleys for zip lining, and

10

features three cartoons of zip line crashes. Id. The evidence also is undisputed that the design "fix" Abraham suggests would degrade the product's functionality for those other purposes. Def. Ex. I at 1.

Even for zip line purposes, Abraham's recommended user-operated braking system is less safe than the alternative braking systems inherent to course design recommended by Petzl and required by industry standards. Def. Ex. I at 1-2; see also ANSI-ACCT 03-2016. Although user-operated braking systems may provide additional functionality and are not prohibited by industry standards, they are insufficient. ANSI-ACCT 03-2016. Kurzinsky's own expert notes that Kurzinsky had the option of purchasing a zip line kit that would have included a braking mechanism. Def. Ex. E at 15-16. No reasonable jury could find that a braking system that fails to meet industry standards must be included along with a pulley that could, alternatively, be incorporated into a system designed to meet those standards without it.

Kurzinsky maintains that Petzl knew its pulleys would be used for backyard zip lines, which are inherently dangerous and associated with high injury rates. Def. Ex. E at 4 ("It is a known fact in the industry that deaths and serious injuries have previously occurred from homemade zip lines in numerous states."). In terms of the Consumer Expectations Test, he argues that Kurzinsky was a foreseeable/intended user, and his backyard zip line was a foreseeable/intended use. Tincher, 104 A.2d at 387.

But the Consumer Expectations Test focuses on "whether the danger . . . was unknowable and unacceptable to the average or ordinary consumer, or whether the ordinary consumer would reasonably anticipate the dangerous condition of the product." Wright v. Ryobi Technologies, Inc., 175 F. Supp. 3d 439, 451-52 (E.D. Pa. 2016). Like the dangers of a saw's rotating blade in Wright, the zip lining dangers Kurzinsky identifies are obvious. The fact that the speed of a zip

11

line will accelerate with any increased force – whether caused by the use of lighter load, steeper angle, or just a push – is self-evident to anyone capable of riding a zip line. Those risks are analogous to the risk of a table saw cutting through any material in its path, regardless of whether it is wood or human fingers. The average and ordinary consumer, even assuming that person is using a commercial-grade mountaineering pulley to construct a backyard zip line, would know and appreciate its basic dangers. See Wright, 175 F. Supp. 3d at 452. They would also appreciate the increased risk of using a straight bar over a seat. Id.

There is no evidence that representations from Petzl misled consumers or minimized the known dangers of zip lining. In terms of the Consumer Expectations Test's "implied/express recommendations" element, Kurzinsky has produced no evidence that Petzl recommended its speed pulley for backyard zip lines. To the contrary, the materials Kurzinsky reviewed, including the sticker on the Pulley, show zip liners who use pulleys equipped with ball bearings crashing into cliffs. Ex. A. They feature multiple skull-and-crossbones. Id. Instead of heeding such warnings, Kurzinsky relied on recommendations from eBay and YouTube, and concedes he never contacted Petzl for clarification when he did not understand the meaning of the skull-and-crossbones next to the crashing zip liner depicted on the Pulley. Pl. Ex. B; Def. Ex. G at 43, 46, 81, 196.

Risk Utility

Kurzinsky alternatively argues that, under the Risk Utility Test, selling the Pulley without an accompanying brake and/or harness is inherently dangerous. Def. Ex. E at 18. Sold on its own, however, the Pulley can be used for direct and indirect hauling, mountaineering, and zip line systems demonstrably safer than those utilizing hand-brakes. Def. Ex. I at 1-2. Petzl is not required to include features that would marginally improve safety for one purpose at the expense

of other purposes when it manufactures a multi-purpose product. Verge v. Ford Motor Co., 581 F.2d 384, 388-89 (1978) (overturning jury verdict and finding Ford was not required to include back-up warning mechanism in chassis that could be used for multiple purposes, some of which would not require a back-up warning mechanism).

As described above, the dangers of backyard zip lining are widely known, open, and obvious, and can be mitigated by a customer exercising care. Tincher, 104 A.3d at 390. Unlike the absence of additional safety features in cases that are sent to the jury on a Risk Utility theory, the proposed safety features in this case would not meet industry standards and would make the product less safe for several purposes. See, e.g., Rapchak, 2016 WL 1018534, at *13-14 (letting jury determine whether manufacturer should have included screen that would have made product safer, albeit potentially less convenient).

Abraham's report acknowledges that Petzl pulleys are also "sold with" braking mechanisms. Def. Ex. E at 15. But manufacturers are not liable for "the manner in which" a non-defective product is used, or for a user's "decision to purchase" a non-defective product. Henry v. Philadelphia Adult Probation and Parole Dept., No 05-4809, 2007 WL 2670140, at *14 (E.D. Pa. Sept. 6, 2007) (dismissing case against ankle bracelet manufacturer whose product failed to incorporate GPS technology because any harm was caused by law enforcement's delay in communicating that the prisoner was out of range, not the product design, which provided only that limited piece of information, not the wearer's location).

Kurzinsky "did not offer any evidence to show that the design of [Petzl's] product caused [his] injuries," and the design of the Pulley did not require Kurzinsky to install it in a system with no braking mechanism and a straight bar. Dorshimer, 145 F. Supp. 3d at 353. "Absent such evidence, plaintiff's design defect claim cannot withstand [Petzl's] summary judgment

13

motion." Id.

Failure to Warn

In his expert report, Abraham focuses on Kurzinsky's last theory, opining that "the instructions lack any wording interpreting the unintelligible diagrams," and fell "below the standard of care in the industry." Def. Ex. E at 18-19. Abraham claims an adequate warning would include a "signal word," like "danger," and then specifically warn consumers that: (1) zip lining is dangerous, (2) zip liners must read and understand the safety instructions, (3) consumers who do not understand the safety instructions should contact Petzl, (4) installing equipment without safety protocols and instructions will lead to a "high probability" of injury, (5) installed equipment "should be inspected by a certified safety specialist in zip lining", and (6) failing to heed these warnings could result in injury or death. Id. at 16-17. Other than requiring inspection by certified safety specialists in zip lining, Abraham provides no information or warning that is not open and obvious. There is no requirement under Pennsylvania law to advise users of open and obvious risks. Fleck, 981 F.2d at 119; see also Dorshimer, 145 F. Supp. 3d at 354 ("Placement of the [product] . . . over an open set of steps, is so obviously unsuitable for use that no warning against it was required.").

Further, the existing instructions already include the signal word "attention" and warn that "installation and use of a cable tyrolean requires the abilities of an expert." Ex. A at 6. No reasonable jury could find Kurzinsky would have heeded the advice to obtain a certified safety specialist to inspect his zip line when he testified that, having read that an expert is required to install and use a cable tyrolean, he still believed his "system was fine" and "[t]here was nothing he would have done differently." Def. Ex. G at 202; see also id. at 230 (if Kurzinsky had read that special training was required to design a zip line system it would not have made a difference

14

in the design of his system). Petzl's literature is designed to be understood in 18 languages, and includes "attention," the need for expertise, four triangles with exclamation points (five including the sticker on the Pulley), and three skull-and-crossbones (four including the one on the sticker). Ex. A. Given that Kurzinsky ignored all these warnings, no reasonable jury could find he would have heeded the warnings Abraham recommends. Manufacturers are not required "to warn against dangers that may arise if the stated warnings are not heeded." Hatcher, 167 F.Supp.3d at 727. They are also not required to warn against even foreseeable misuse. Spowal v. ITW Food Equip. Gr. LLC, 943 F. Supp. 2d 550, 563 (W.D. Pa. 2013) (because using the mixer's paddle for wiping hands violated FDA standards, manufacturer was not required to warn against the misuse even though it was foreseeable).

Abraham also opines that Petzl should have "placed Mr. Kurzinsky on notice so that he [could] make a prudent decision with reference to purchasing a complete kit from Petzl and follow their instructions which would incorporate a braking system with a pulley and a harness." Def. Ex. E at 16. As described above, the Pulley had multiple intended purposes. Def. Ex. I at 1-2. Manufacturers are not liable for a user's decision to purchase a product that does not come with a specific feature if the lack of that feature is not a design defect. Henry, 2007 WL 2670140, at *14. Manufacturers' legal obligations to provide instructions depend on the "nature of the product." Tincher, 104 A.3d at 387. Petzl is only required to warn of hidden dangers, and "is not required to anticipate all the possible uses, including various designs, for which its [product] will be put and warn of dangers related to the finished product." Petrucelli v. Bohringer, No. 91-2098, 1994 WL 81999, at *6 (E.D. Pa. March 10, 1994).

Other failure to warn cases are instructive. In Wenrick, a component manufacturer was sued when a switch was accidentally triggered because it was "unguarded" and located above a

15

set of stairs. Wenrick, 564 A.2d at 1246. Because the system designer, not the component manufacturer, determined the kind of switch to purchase ("unguarded") and its location, the component manufacturer was not required to warn of the specific dangers related to those decisions. Id. at 1248. By contrast, the component manufacturer in J. Meade Williamson and F.D.I.B. Inc. v. Piper Aircraft Corp., 968 F2d 380, 386 (3d Cir. 1992) designed a pump joint that required installation with countersunk screws and Loctite, an adhesive, and was aware of its intended use in a location that foreclosed inspection. The component manufacturer drafted preliminary instructions informing the system designer of these requirements but failed to send them. Id. Because the manufacturer failed to inform the system designer of the hidden danger of failing to use countersunk screws and Loctite during installation, it was found liable. Id.

Like the manufacturer in Wenrick, "[a]ll the decisions and actions whereby the danger was created," i.e., the decision not to include a braking mechanism, and to use the straight bar, were Kurzinsky's, and the associated dangers were not hidden. Wenrick, 564 A.2d at 1248. Kurzinsky testified he was aware the Pulley did not include a braking mechanism when he designed his system and, "[w]hen he first tried it, [he] felt there was no reason for it." Def. Ex. G at 193-94. When a component manufacturer has no "control over the assembly of the final product," there is no obligation to warn of dangers related to the assembly. Callender v. Brighton Mach. Co., Inc., No. 755 WDA 2013, 2014 WL 1057351, at *5 (Pa. Super. Sept. 17, 2014). No reasonable jury could find Petzl responsible for Kurzinsky's informed decision to purchase the Pulley and use it in the system he improperly designed.

2. Negligence

Kurzinsky must set forth sufficient evidence that a reasonable jury could find Petzl (1) had a duty to him, which it (2) breached, (3) causing (4) actual injury. Krentz v. Conrail, 910

16

A.2d 20, 27 (Pa. 2006).

Petzl argues Kurzinsky failed to establish a duty because he did not identify a standard of care. Def. Mot. at 24. Abraham lists 13 "voluntary and statutory standards relating to warnings and instructions" with which he claims Petzl's product information should have, but did not, comply. Def. Ex. E at 11-12. Thus, Kurzinsky's negligence claim is based on Petzl's failure to warn.

Proximate causation is analyzed under the "substantial factor" test. Sweitzer v. Oxmaster, Inc., No. 09-5606, 2010 WL 5257226, at *6 (E.D. Pa. Dec. 23, 2010). The same causation standard applies in negligence and strict liability cases, although the "standard for establishing liability of a product manufacturer under a negligence theory [is] more stringent and, thus, difficult to satisfy." Sikkelee v. AVCO Corp., 268 F. Supp. 3d 660, 715 (M.D. Pa. 2017) (citing Schwartz v. Abex Corp., 106 F. Supp. 3d 626, 654 (E.D. Pa. 2015)).

As discussed above, Kurzinsky has failed to produce sufficient evidence from which a jury could find the recommended warnings are required, and has produced undisputed evidence that he would not have followed those warnings even if they had been provided. Def. Ex. G at 202. He has therefore failed to produce sufficient evidence from which a jury could find Petzl liable for negligence. Sikkelee, 168 F. Supp. 3d at 716 (evidence that was insufficient to sustain a strict liability claim was also insufficient to sustain the analogous negligence claim).

3. Breach of warranty

To establish his breach of warranty claim, Kurzinsky must set forth sufficient evidence to support a finding that Petzl's Pulley was not "fit for the ordinary purposes for which it was used," or that it was inadequately "contained, packaged, [or] labeled." 13 Pa. Cons. Stat. §§ 2341(b)(3), 2341(b)(5).

Kurzinsky's breach of warranty claim fails on the same basis as his strict liability claim, discussed above. He has not produced any evidence the Pulley was unfit for its ordinary purposes, including use in a properly-designed zip line, or that its warnings were inadequate.

Kurzinsky's claims against Petzl should be dismissed. An appropriate Order follows.